UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHAEL D. JOHNSON, *et al.*,  )<br>  )<br>Plaintiffs,  )<br>  )<br>v.  )<br>  )<br>PARKER-HANNIFIN,  )<br>CORPORATION, *et al.*,  )<br>  )<br>Defendants.  )<br>  ) | CASE NO.  1:21-cv-00256<br><br>JUDGE BRIDGET MEEHAN BRENNAN<br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Before this Court is the motion to dismiss (Doc. No. 45) filed by Defendants Parker-Hannifin Corporation ("Parker"), Board of Directors for Parker, Human Resources and the Compensation Committee of the Board of Directors for Parker, and Parker Total Rewards Administration Committee.  This motion is fully briefed.  (Doc. Nos. 47, 51.)  For the following reasons, the motion to dismiss is GRANTED, and the case is dismissed.

## I.  Background

### A.  ERISA and Defined-Contribution Plans

An employee's retirement is likely bound up in a defined-contribution plan – with a 401(k) plan being the most common investment vehicle.  *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1162 (6th Cir. 2022).  Employers who sponsor defined-contribution plans designate plan administrators to create a menu of investment options for plan participants.  *Hughes v. Nw. Univ.*, 595 U.S. 170, 173 (2022).  Employees who participate in a defined-contribution plan select investments from this menu, but the dollar amount in their retirement account depends on the success of those investments.  *See Forman v. TriHealth, Inc.*, 40 F.4th 443, 446 (6th Cir. 2022).

A plan's investment menu may include "target-date funds": "a single diversified investment vehicle . . . offered as a suite of funds typically identified by the [employee's] retirement date."  (Doc. No. 20 at 549, ¶ 45.)  *See also Target Date Funds: Evidence Points to Growing Popularity and Appropriate Use by 401(k) Plan Participants, Employee Benefit Research Institute*, Employee Benefit Research Institute, at 1 (2021).  Target-date funds are composed of a variety of underlying investments, including other funds, stocks, bonds, and cash.  *See CommonSpirit*, 37 F.4th at 1164.  (*See* Doc. No. 20 at 550, ¶ 48.) [1]

Not all target-date funds are alike.  Some funds employ an "active" strategy, selecting investments that are dependent on portfolio managers "actively mak[ing] investment decisions and intitiat[ing the] buying and selling of securities in an effort to maximize return."  *Id.* (quotations omitted).  Funds deploying "passive" strategies select investments that mirror some pre-defined benchmark like the S&P 500.  *Id.*  Target-date funds also feature different "glidepaths": the reallocation of investments based on the intended investor's retirement date.  *Id.* at 1164.  Some employ a "to" glidepath, which reaches its most conservative asset allocation at retirement.  Others adopt a "through" glidepath, achieving the most conservative asset allocation past retirement.  *Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries*, U.S. Department of Labor, Employee Benefits Security Administration, at 1 (2013).

The employer's selection of funds for a plan has significant consequences for the success of the employee's retirement.  *See CommonSpirit*, 37 F.4th at 1162.  For example, funds charge different management fees, with active funds generally imposing higher fees than passive funds.

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

*Id.* at 1163.  Paying higher than necessary fees significantly impacts the long-term value of an employee's retirement account.  *Id.*

> Fixed management fees imposed annually on the value of a fund, ranging from 10 to 100 basis points (or .1% to 1%), can erode or at least undercut growth.  In one year, a one percent management fee would reduce a 5% increase in a fund to 4%, and it would increase a 5% loss in a fund to 6%.  For example, $100,000 invested at a 5% growth rate would generate $265,330 in 20 years, but with a 1% management fee it becomes $219,112, 83% of what it would have been without the fees.  Over time, management fees, like taxes, are not trivial features of investment performance.

*Id.*  In light of these fees, many funds offer lower-fee shares to institutions with large defined-contribution plans.  *See Forman*, 40 F.4th at 450.

The Employee Retirement Income Security Act of 1974 ("ERISA") establishes standards of conduct, protecting employees from employers' mismanagement of retirement plans.  *Forman*, 40 F.4th at 447-48.  It requires plan fiduciaries – those exercising discretionary authority or control over a plan, administering the plan, or rendering investment advice – to fulfill their duties "with the care, skill, prudence, and diligence" that a professional "acting in like capacity and familiar with such matters" would use.  29 U.S.C. §§ 1002(21)(A) and 1104(a)(1)(B).  "Derived from the law of trusts, the [ERISA] duty of prudence requires plan administrators to select initial investment options with care, to monitor plan investments, and to remove imprudent ones."  *Forman*, 40 F.4th at 448 (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 528-29 (2015)).  Plaintiffs claim Defendants violated the fiduciary duty of prudence.

### B.  Plaintiffs' Allegations

#### 1.  The Plan

Parker is an Ohio corporation with its principal headquarters in Cleveland, Ohio.  (Doc. No. 20 at 540, ¶ 21.)  Parker is the sponsor of the Parker Retirement Savings Plans (the "Plan").  (*Id.* at 534, 540, ¶ 11, 22.)  The Plan is a defined-contribution, individual-account, employee-

pension benefit plan.  (*Id.* at 538, ¶ 11.)  As of December 31, 2018, the Plan had over $4.3 billion in net assets and over 32,000 participants.  (*Id.* at 538, ¶ 14.)  The Plan is among the largest 0.03% of all defined-contribution plans in the United States.  (*Id.* at 538, ¶ 15.)  Industry professionals commonly refer to plans of such size as "jumbo plans" or "mega plans."  (*Id.*)

Parker manages the Plan through various governing bodies and employees.  (*See id.* at 540, ¶ 22.)  Defendant Board of Directors (the "Board") exercises discretionary authority and control over the Plan while also overseeing and monitoring the Plan's administration.  (*See id.* at 541, ¶ 24.)  The Board is informed about the Plan by Defendant Human Resources and Compensation Committee of the Board (the "Compensation Committee").  (*Id.* at 541-42, ¶ 26.) The Compensation Committee establishes, maintains, and appoints the members of the Defendant Parker Total Rewards Administration Committee (the "Administration Committee"). (*Id.* at 542, ¶ 27.)  The Administration Committee facilitates and provides oversight over the Plan.  (*Id.* at 542, ¶ 29.)  All Defendants are Plan fiduciaries.  (*Id.* at 534-35, ¶ 1.)

Plaintiffs Michael Johnson, Matthew Collaro, John Berg, Mallikarjun Kandula, and Tyler Seamons are former Parker employees and current Plan participants.  (*Id.* at 539-40, ¶¶ 16-20.) They bring their claims individually and as representatives of a class of Plan participants and beneficiaries.  (*Id.* at 534, ¶ 1.)

## 2.  Retention of Underperforming Funds

Plaintiffs' first claim centers Defendants' selection and retention of target-date funds (the "Focus Funds") managed by the Northern Trust Corporation ("Northern Trust").  (*See id.* at 555, ¶ 63.)

The Focus Funds were collective investment trusts[2] "comprised primarily of index or passive strategies in the various asset classes utilized."  (*Id.* at 555-56, ¶ 63.)  They utilized a "through" glidepath.  (*Id.* at 560, ¶ 7.)  Northern Trust began offering the Focus Funds in 2009. (*Id.* at 556, ¶ 65.)  Northern Trust claimed that the Focus Funds were backtested, meaning Northern Trust's qualitative models determined that the funds would have performed well had they been offered in prior years.  (*Id.*)  Backtested data is purely hypothetical and subject to manipulation.  (*Id.* at 556-57, ¶ 65.)

In 2013, Defendants added the Focus Funds to the Plan.  (*Id.* at 564, ¶ 82.)  This decision was effective on February 1, 2014.  (*Id.* at 565, ¶ 83.)  All Plan assets in the Plan's then-current target-date fund option, the actively managed Fidelity Freedom Funds, were transferred to the Focus Funds.  (*Id.*)  This constituted about $800 million in Plan assets.  (*See id.*)  The Focus Funds remained in the Plan until September 30, 2019.  (*Id.* at 569, ¶ 94.)

Plaintiffs allege that the Focus Funds showed severe signs of distress before 2013.  In one year before Defendants added the Focus Funds to the Plan, the Focus Funds' assets had a 90% turnover rate.  (*Id.* at 564, ¶ 80.)  This turnover created "unusual transaction costs for funds of this nature and design."  (*Id.*)  The average asset turnover for all target-date funds was only 23.5% as of 2010.  (*Id.* at 564, ¶ 81.)  A higher-than-average turnover rate may indicate an investment manager's lack of experience or an attempt to mask a fund's underperformance.  (*Id.*

---

[2] Target-date funds are commonly offered as mutual funds or collective investment trusts.  (Doc. No. 20 at 550, ¶ 48.)  Mutual funds and collective investment trusts similarly "invest in a variety of securities to create a diversified investment portfolio."  (*Id.*)

at 553-54, ¶ 59.)  The Focus Funds also underperformed relative to the S&P target-date fund benchmark from 2010-2013.[3]  (*Id.* at 557-60, ¶¶ 68-70.)

Plaintiffs highlight three target-date funds that Defendants could have initially picked for the Plan or eventually selected to replace the Focus Funds.

First are the Vanguard Target Retirement Trust Plus funds (the "Plus Funds").  (*Id.* at 560, ¶ 71.)  Like the Focus Funds, the Plus Funds maintained a "through" glidepath and employed a passive investment strategy.  (*Id.*)  The Plus Funds outperformed the Focus Funds in 2013 based on three-year trailing returns.  (*Id.* at 560, ¶ 72.)  The Plus Funds also outperformed the Focus Funds throughout the period the Focus Funds were in the Plan.  (*Id.* at 569, ¶ 94.) "Had Defendants removed the Focus Funds and selected the [Plus Funds], Plan participants would not have lost $45 million of their retirement assets."  (*Id.* at 570, ¶ 97.)

Second are the TIAA-CREF Lifecycle Index Funds (the "Lifecycle Funds").  (*Id.* at 563, ¶ 73.)  Like the Focus Funds, the Lifecycle Funds were relatively new to the market, launching in 2010.  (*Id.*; *see also id.* at 556, ¶ 65.)  The Lifecycle Funds were also passively managed funds with "through" glidepaths.  (*Id.* at 563, ¶ 74.)  The Lifecycle Funds outperformed the Focus Funds in 2013 based on three-year trailing returns.  (*Id.* at 562, ¶ 75.)  The Lifecycle Funds outperformed the Focus Funds throughout the period they were in the Plan.  (*Id.* at 569, ¶ 94.) "Had Defendants removed the Focus Funds and selected the [Lifecycle Funds], Plan participants would not have lost over $62 million of their retirement assets."  (*Id.* at 570, ¶ 97.)

Third are the T. Rowe Price Retirement Funds (the "Price Funds").  (*Id.* at 562, ¶ 76.) Unlike the Plus, Lifecycle, and Focus Funds, the Price Funds used an active investment strategy.

---

[3] The Focus Funds continued to underperform relative to the S&P target-date fund benchmark throughout the period the funds were offered in the Plan.  (Doc. No. 20 at 566-67, ¶¶ 86-87.)

(*Id.*)  Similar to the Focus Funds, the Price Funds had a "through" glidepath.  (*Id.*)  The Price

Funds outperformed the Focus Funds in 2013 based on three-year trailing returns.  (*Id.* at 563, ¶

78.)  This outperformance continued during the years the Focus Funds were in the Plan.  (*Id.* at

569, ¶ 94.)  "Had Defendants removed the Focus Funds and selected the [Price Funds], Plan

participants would not have lost over $73 million of their retirement assets."  (*Id.* at 570-71, ¶

97.)

### 3.  Excessive Fees

Count Two alleges that the Plan included funds with excessive fees.

The Focus Funds, like many other mutual funds and collective trusts, offered institutional

investors different shares for each respective fund.  (*Id.* at 573-74, ¶ 105; *see also id.* at 571-72, ¶

100.)  Defendants invested in the Focus Funds' K shares, which had a .07% fee.  (*Id.* at 573-74, ¶

105.)  The Focus Funds' J shares only had a .02% fee.  (*Id.*)  The .05% fee difference between

the Focus Funds' K and J shares was the only distinction between the two shares.  (*See id.*; *see

also id.* at 571-72, ¶ 100.)  They had an identical manager, were managed in the same manner,

invested in the same portfolio, and allocated assets in the same fashion.  (*See id.* at 571-72, ¶

100.)

There were other funds included in the Plan that offered lower-fee shares.  (*Id.* at 574, ¶

106.)  The Vanguard Total Bond Market Index, Vanguard Extended Market Index, and the

Vanguard Total International Stock Index funds (collectively the "Vanguard Funds") offered

shares with .03-.01% lower fees than the shares selected by Defendants.  (*Id.* at 574, ¶¶ 106-07.)

As with the Focus Funds, the shares for each Vanguard fund were the same except for fees.  (*See

id.* at 571-72, ¶ 100.)

Plaintiffs maintain that the decision to include the shares with higher fees was inconsistent with Defendants' fiduciary obligations to the Plan.  Large plans, like the Plan here, have "tremendous bargaining power to obtain share classes with far lower costs" – even if the amount invested by the plan is not enough to qualify for the lowest-fee shares.  (*Id.* at 572, ¶ 102.)  In fact, Vanguard expressly stated that they reserved the right to establish higher or lower fees for certain investors.  (*Id.* at 573, ¶ 103.)  If they forced Vanguard and Northern Trust to offer their lower-fee shares, Defendants "would have saved millions of dollars in Plan assets." (*Id.* at 574, ¶ 107.)

### 4.  Count Three: Failure to Monitor

Plaintiffs bring Count Three against Parker, the Board, and the Compensation Committee.  (*Id.* at 585, ¶ 130.)  Plaintiffs allege that these Defendants did not ensure that the other entities and people appointed to make decisions regarding the Plan fulfilled the fiduciary obligations mandated by ERISA.  (*See id.* at 585-87, ¶¶ 129-36.)

### C.  Procedural Background

On January 29, 2021, Plaintiffs initiated this action.  (Doc. No. 1.)  On April 13, 2021, Defendants moved to dismiss the complaint.  (Doc. No. 10.)

On June 11, 2021, Plaintiffs filed an amended complaint, which Defendants moved to dismiss on July 23, 2021.  (Doc. Nos. 20, 22.)  After this motion was fully briefed (Doc. Nos. 30, 33), the parties filed numerous notices of supplemental authority and responses to these notices (*e.g.*, Doc. Nos. 34-38, 39-41).

On July 26, 2022, the Court held a status conference.  (7/26/2022 Minutes of Proceedings.)  At the conference, due to the ERISA law developments highlighted in the parties' notices of supplemental authority, the parties and the Court agreed that the best course of action

was to allow the parties to resubmit their motion to dismiss briefs to address recent decisions from the Sixth Circuit.  (*Id.*)  Plaintiffs notably did not seek to amend their complaint a second time.  (*See id.*)

## II.  Discussion

### A.  Standard of Review

When addressing a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true.  *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The sufficiency of the complaint is tested against the notice pleading requirement that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).

Rule 8(a)(2) requires a plaintiff to allege facts "providing not only fair notice of the nature of the claim, but also grounds on which the claim rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007) (internal quotations omitted).  "And the complaint's factual allegations, taken as true, 'must be enough to raise a right to relief above the speculative level.'  That means the complaint must allege facts supporting an inference that the defendant's liability is plausible, rather than just possible."  *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, – F.4th –, No. 22-3765, 2023 WL 8183812, at *2 (6th Cir. Nov. 27, 2023) (quoting *Twombly*, 550 U.S at 555).  As such, the court will not permit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ."  *Iqbal*, 556 U.S. at 778 (citations omitted).

If a plaintiff pleads facts that reveal a flaw in the claim or substantiate a defense, she may

plead herself out of federal court.  In other words, "sometimes the allegations in the complaint affirmatively show that the claim is [deficient or disallowed as a matter of law].  When that is the case, as it is here, dismissing the claim under Rule 12(b)(6) is appropriate."  *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012); *see also Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010); *O'Gorman v. City of Chicago*, 777 F.3d 885, 889 (7th Cir. 2015) ("A complainant can plead himself out of court by including factual allegations that establish that the plaintiff is not entitled to relief as a matter of law.").

When a court is presented with a Rule 12(b)(6) motion, it may only consider material related to the pleadings.  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  Documents are considered related to the pleadings if they are attached to either the complaint or the defendant's motion to dismiss, referred to in the complaint, and central to the plaintiff's claims.  *Id.*  A court has complete discretion to determine "whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion."  *Barrett v. Harrington*, 130 F.3d 246, 253 (6th Cir. 1997) (citation omitted).

### B.  Count One

Plaintiffs' first breach of fiduciary duty claim alleges that Defendants imprudently selected the Focus Funds when better performing funds were available, and Defendants failed to evaluate and replace the Focus Funds when they underperformed.  (*E.g.*, Doc. No. 20 at 583, ¶ 120.)

#### 1.  Meaningful Benchmarks

The Sixth Circuit has recently addressed the pleading requirements necessary to survive a Rule 12(b)(6) challenge when bringing a claim like Count One.  In *CommonSpirit* and *Forman*, the plaintiffs' underperformance claims alleged that funds with lower fees and better returns

could have and should have been selected. *CommonSpirit*, 37 F.4th at 1166; *Forman*, 40 F.4th at 449-50. The courts found that the plaintiffs failed to state a viable ERISA breach of fiduciary duty claim. *CommonSpirit*, 37 F.4th at 1170; *Forman*, 40 F.4th at 449-50.

At a minimum,[4] for these types of allegations to support a claim, the complaint must contain sufficient "context," showing that the challenged funds underperformed relative to their stated goals. *CommonSpirit*, 37 F.4th at 1164-65; *Forman*, 40 F.4th at 449. And, if the plaintiff chooses to do so through comparator funds, she must show that the challenged funds and the comparator funds share the same investment "strategies," "risk profiles," and "objectives." *CommonSpirit*, 37 F.4th at 1165, 1167. Without such a showing, the plaintiff has not shown the challenged funds have, in fact, underperformed:

> Different services, investment strategies, and investor preferences invariably lead to a spectrum of options – and in turn a spectrum of reasonable fee structures and performance outcomes. As a result, side-by-side comparisons "of how two funds performed in a narrow window of time, with no consideration of their distinct objectives, will not tell a fiduciary which is the more prudent long-term investment option." Even comparator investments that are "sponsored by the same company, managed by the same team, and use a similar allocation of investment types" will be inapt when "each fund has distinct goals and distinct strategies."

*Forman*, 40 F.4th at 449 (citations omitted; quoting *CommonSpirit*). Put another way, an ERISA plaintiff is required to plead sufficient facts demonstrating that the challenged funds underperformed relative to a "meaningful benchmark." *CommonSpirit*, 37 F.4th at 1167

---

[4] Defendants argue that simply alleging underperformance compared to a meaningful benchmark is not enough to state a viable claim under *CommonSpirit*. (Doc. No. 46 at 1237.) That may be correct. *CommonSpirit*, 37 F.4th at 1167 ("Nor is it clear that an after-the-fact performance gap between benchmark comparators by itself violates the process-driven duties imposed on ERISA fund managers."). But the Court need not consider what, if anything, Plaintiffs would be required to allege because Plaintiffs have not overcome the "[i]mportant" "meaningful benchmark hurdle." *Forman*, 40 F.4th at 451 (citing *CommonSpirit*); *see also Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1147-48 (10th Cir. 2023) (noting that *CommonSpirit* requires the plaintiff to provide "a meaningful comparison . . . [that] take[s] account of the separate goals and separate risk profiles of the funds at issue." (quotation marks omitted)).

11

(quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)).  None of Plaintiffs' comparators – the S&P target-date benchmark, the Price Funds, the Plus Funds, or the Lifecycle Funds – constitute meaningful benchmarks.

To start, the S&P target-date benchmark is not a fund but a statistical data composite created from a "universe of target date funds." *S&P Target Date Index Series Methodology*, S&P Dow Jones Indices, at 3 (2023).  Other courts have found that such an index could never serve as a meaningful benchmark for a real fund with unique investment strategies, goals, and asset allocations.  *Hall v. Cap. One Fin. Corp.*, No. 122CV00857MSNJFA, 2023 WL 2333304, at *7 (E.D. Va. Mar. 1, 2023) (collecting cases); *see also Selecting a Target-Date Benchmark*, Morningstar, at 1 (2017) (stating that the S&P Target Date Index Series is "all but useless in helping stakeholders assess the performance of the target maturity funds").  But if it could, the complaint does not allege that the benchmark represents the Focus Funds' unique investment strategies and long-term objectives.  *See Wehner v. Genentech, Inc.*, No. 20-cv-06894-WHO, 2021 WL 2417098, at *8 (N.D. Cal. June 14, 2021) (finding that the S&P target-date benchmark did not serve as a meaningful comparator because the complaint did nothing but state that it was in a conclusory fashion).

Plaintiffs' reliance on three identified target-date funds suffers a similar fate due to insufficient allegations.

Beginning with the Price Funds, these funds were actively managed.  (Doc. No. 20 at 562, ¶ 76.)  The Focus Funds were passively managed.  (*Id.* at 555-56, ¶ 63.)  *CommonSpirit* and *Forman* provide that actively managed funds cannot, as a matter of law, serve as meaningful benchmarks to passively managed funds.  *Forman*, 40 F.4th at 449 (noting that *CommonSpirit* "rejected" the creation of "liability whenever a plan chooses actively managed funds over

12

passively managed funds"); *see also Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020) ("[Passively managed funds and actively managed funds] have different aims, different risks, and different potential rewards that cater to different investors.  Comparing apples and oranges is not a way to show that one is better or worse than the other."); *Davis v. Salesforce.com, Inc.*, No. 20-cv-01753-MMC, 2020 WL 5893405, at *3 (N.D. Cal. Oct. 5, 2020) (holding that "passively managed funds are not comparable to actively-managed funds in any meaningful way." (quotations omitted)).

Plaintiffs' complaint also fails to plausibly allege that the passively managed funds pleaded here – the Plus and Lifecycle Funds – are meaningful benchmarks.  Plaintiffs allege that the Focus, Plus, and Lifecycle Funds are similar in two respects: they were passively managed and had "through" glidepaths.  (Doc. No. 20 at 555-56, ¶ 63; *id.* at 560, ¶ 71; *id.* at 561, ¶ 74.)  But to "plausibly plead that these available alternatives were otherwise equivalent" to the Focus Funds, Plaintiffs were required to include allegations about the funds' distinct "objectives," "strategies," and "goals."  *Forman*, 40 F.4th at 449.  Simply alleging that the funds were all passively managed and had "through" glidepaths falls well short of the Sixth Circuit's pleading requirement.  *See id.*

Finding these allegations are insufficient to sustain underperformance is further supported by *Meiners* – a case extensively cited in *CommonSpirit*.  In *Meiners*, the Eighth Circuit rejected the notion that just because two funds were passively managed, they could serve as meaningful benchmarks.  *Meiners*, 898 F.3d at 823; *Meiners v. Wells Fargo & Co.*, No. CV 16-3981(DSD/FLN), Doc. No. 1 at 9, ¶ 27 (D. Minn. 2017).  Instead, the court stressed that the plaintiff must *also* allege that the passive funds shared the same investment strategy.  *Meiners*, 898 F.3d at 823.  As described above, the complaint does not contain any allegations about the

13

Focus Funds', Plus Funds', and Lifecycle Funds' investment strategies – let alone that they are
sufficiently similar.[5]

     Additionally, Plaintiffs do not respond to Defendants' assertion that the Focus Funds had
a uniquely conservative investment strategy and asset allocation compared to the Plus and
Lifecycle Funds.  To support their point, Defendants cite publicly available documentation about
the funds' asset allocations and investment strategies.  (Doc. No. 46 at 1240 (citing fund fact
sheets, SEC reports, and Morningstar reports).)  This is the same type of information considered
in *CommonSpirit.*  37 F.4th at 1168 (citing Morningstar reports and noting these reports can be
considered at the motion to dismiss stage because they were central to the plaintiff's claim,
publicly available, and judicially noticeable).  In response, Plaintiffs merely state this Court
cannot disregard their allegations in favor of Defendants' interpretation of "cherry-picked" and
"disputed" publicly available information.  (Doc. No. 48 at 1574.)

     Plaintiffs are correct that the Court cannot consider only Defendants' interpretation of
publicly available information on these funds' objectives, asset allocations, and strategies; rather,
it must consider the information provided by Defendants in a light favorable towards the
complaint's allegations.  *See Nolan v. Detroit Edison Co.*, 991 F.3d 697, 707-08 (6th Cir. 2021).
The Court has done so.  Nonetheless, there is no complaint allegation that is disregarded by the
Court's consideration of documents establishing that the Focus Funds had a distinctly
conservative investment strategy and asset allocation.  Nor have the Plaintiffs explained how
Defendants' reliance on these documents "cherry-picks" "disputed" information to falsely

---

[5] Unlike Plaintiffs here, the plaintiff in *Meiners* did not allege that the funds all had "through"
glidepaths.  But, according to the complaint, this allegation does not provide much information
about the funds' objectives, strategies, and risk-profiles.  (*See* Doc. No. 20 at 550, ¶ 49 (alleging
that having a "through" glidepath merely means that the fund will reach its most conservative
asset allocation past the employee's expected retirement date).)

characterize these funds as dissimilar.  Instead, Plaintiffs simply assert that whether these funds are meaningful benchmarks should not be decided at the motion to dismiss stage but left to a jury after discovery. [6]  (Doc. No. 48 at 1575.)  This exact argument was rejected in *CommonSpirit*. 37 F.4th at 1168-69 (noting that an ERISA plaintiff will often have to utilize publicly available information to withstand a Rule 12(b)(6) motion and obtain discovery to support her claim).

### 2.  Additional Allegations

Without any meaningful benchmarks alleged, all that supports Count One is the notion that selecting the Focus Funds in 2013 was imprudent because the funds were new to the market and had a high asset turnover rate.  (Doc. No. 20 at 564, ¶ 82.)

### a.  Statute of Repose

Count One is untimely under ERISA's statute of repose.  29 U.S.C. § 1113 mandates that an ERISA breach of fiduciary duty claim be brought within "six years [] after the date of the last action which constituted a part of the breach or violation."  In this context, Plaintiffs' allegations about Defendants' conduct outside of the six-year window can support Count One *if* the complaint also includes allegations of related misconduct occurring inside Section 1113's repose period.  In other words, allegations about the Focus Funds' improper selection are not time-barred *if* Plaintiffs also pleaded viable allegations that Defendants improperly retained the Focus

---

[6] *Parker v. GKN N. Am. Servs., Inc.*, No. 21-12468, 2022 WL 3702072 (E.D. Mich. Aug. 26, 2022) is the only post-*CommonSpirit* case within this circuit cited by Plaintiffs finding that an ERISA underperformance claim could withstand a motion to dismiss.  (Doc. No. 48 at 1572.) But this case only further elucidates the bare-bones nature of Plaintiffs' complaint.  For example, the *GKN* plaintiffs alleged that the challenged funds should have been replaced by funds within the same Morningstar category.  2022 WL 3702072, at *4.  "MorningStar categories are divided into four broad asset classes and sixty-four categories to show performance relative to a benchmark."  *Id.* (quotation marks omitted).  Following *CommonSpirit* and *Forman*'s mandate for context, the court noted that Morningstar considers the "potential risks and rewards" of each categorized fund.  *Id.*  Plaintiffs have not alleged that the Focus Funds are in the same Morningstar category as any of their alleged meaningful benchmarks.

Funds.  *Tibble*, 575 U.S. at 530.  But, as described above, Plaintiffs have not pleaded facts from which the Court could reasonably infer that the Focus Funds were underperforming relative to their objectives and thus were improperly retained.  Count One is thus time-barred by Section 1113.

### b.  Insufficient Allegations

Even if Count One were not barred by the statute of repose, the allegations in Count One do not support a cognizable claim.

First, there is persuasive authority rejecting the argument that an investment is imprudent simply because it has a limited or no performance history.  *Jones v. Dish Network Corp.*, No. 22-CV-00167-CMA-STV, 2023 WL 2796943, at *15 (D. Colo. Jan. 31, 2023) (collecting cases); *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 705 (W.D. Mo. 2019) ("Plaintiffs[] cite no authority holding that the implementation of a fund without a long performance history is per se imprudent.").  And Plaintiffs have cited no authority to the contrary.  In fact, as Defendants note, Plaintiffs' imprudence charge is undermined by their allegation that Defendants should have selected the Lifecycle Funds, which had a similarly limited performance history as of 2013, the year Defendants added the Focus Funds to the Plan.  (*Compare* Doc. No. 20 at 555, ¶ 63 (alleging that Focus Funds were launched in 2009) with *id.* at 561, ¶ 73 (alleging that the Lifecycle Funds "were funds with over 5 years of performance history as of 2015").)

Second, Plaintiffs did not allege sufficient facts establishing that the high turnover rates for the Focus Funds' assets prior to Defendants' selection of the Focus Funds can sustain an imprudence claim.  Again, under *CommonSpirit* and *Forman*, ERISA complaints must provide sufficient factual context to allege that an investment decision was imprudent.  *CommonSpirit*, 37 F.4th at 1164-65; *Forman*, 40 F.4th at 449.  All Plaintiffs have stated here is that the "all of

16

the funds in the Focus Funds" had a 90% percent asset turnover rate and that a turnover rate over

30% is a sign "that the manager is not following a disciplined investment strategy."  (Doc. No.

20 at 564, ¶ 81.)  But turnover in asset allocation is a "natural feature" for some funds.

*CommonSpirit*, 37 F.4th at 1167-68.  Without providing any context for the assets' turnover rates

relative to their stated investment strategies and long-term objectives, Plaintiffs have failed to

demonstrate how this allegation supports their claim.  The Court also notes that Plaintiffs'

allegation that an over 30% turnover constitutes a "red flag" is severely undermined by the fact

that the Price, Plus, and Lifecycle Funds also had turnover rates of over 30%.  (Doc. No. 48 at

1573 (not contesting Defendants' citations establishing that all of Plaintiffs' proposed

meaningful benchmarks experienced turnover rates of higher than 30%).)

Accordingly, Defendants' motion to dismiss Count One is granted.

### C.  Count Two

Plaintiffs claim that Defendants breached their fiduciary duties by not obtaining the

institutional shares with the lowest fees for the Focus Funds and the Vanguard Funds.  Plaintiffs

maintain that Defendants could have used the Plan's bargaining power to obtain better shares

even if the Plan did not technically satisfy the lower-fee share's investment thresholds.  (Doc.

No. 20 at 572, ¶ 102.)

Defendants, citing publicly available information about the Plan and the Vanguard Funds,

argue that the Plan did not hit the $100 million investment threshold necessary to qualify for the

lower-fee Vanguard shares.  (Doc. No. 46 at 1235-36, 1248-49.)  They further highlight that the

Plan contained another fund managed by Vanguard that was not mentioned in the complaint, and

for this fund, the Defendants qualified and obtained the lowest-fee shares.  (*Id.* at 1249.)  To

Defendants, if the Plan did not qualify for the lowest-fee shares, they did not breach any

fiduciary duty by not obtaining them.  (*Id.* at 1250.)  Regarding the Focus Funds, Defendants argue that Plaintiffs failed to allege that the Plan qualified for the institutional shares with the lowest fees.  (*Id.* at 1249.)  This pleading failure means that the claim fails.  (*See id.*)

Plaintiffs turn to *Forman* for support.  (*See* Doc. No. 48 at 1577.)  One claim in *Forman* alleged that the defendants "violated the duty of prudence by offering [the plaintiffs] pricier retail shares of mutual funds when those same investment management companies offered less expensive institutional shares of the same funds to other retirement plans."  40 F.4th at 450.  The court held that this claim plausibly entitled the plaintiffs to relief, and the claim survived the motion to dismiss.  *Id.*

In reaching this decision, the court first noted that there was a consensus amongst other circuits that a plaintiff may bring an imprudence claim when a large plan offers high-fee retail shares when lower-fee institutional shares are available.  *Id.* 450-51 (discussing *Washington Univ.*, 960 F.3d at 483 (challenged plan offered retail shares over institutional shares); *Sacerdote v. New York Univ.*, 9 F.4th 95, 108 (2d Cir. 2021) (same); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 331 (3d Cir. 2019) (same); *Kong v. Trader Joe's Co.*, No. 20-56415, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) (same)).  Undergirding these decisions was the fact that retail shares were typically reserved for "individual investors."  *Id.* at 447.  But the defendants in these cases were plainly not individual investors and could have plausibly "exploit[ed] the advantages of being a large retirement plan" to obtain lower-fee institutional shares.  *Id.* 450.

The court in *Forman* also stressed that the complaint must still include sufficient allegations to withstand ERISA's "context-sensitive" pleading analysis.  *Id.* at 453.  It warned that "mere allegations that a retirement plan chose retail over institutional share classes – or failed to utilize other volume-based discounts – does not provide a universal golden ticket past a

18

motion to dismiss." *Id.* The court ultimately concluded that the plaintiffs pleaded more than enough factual context to plausibly allege that the defendants acted imprudently by choosing to obtain retail shares:

> [The plaintiffs] noted that [the] plan has nearly half a billion dollars in assets. They put together a chart showing that the issuers of seventeen of [the plan's] mutual funds offered different share classes that charged lower fees to other clients. The holders of different share classes, they alleged, held the same investments, and were subject to the same restrictions concerning deposits and withdrawals. The only difference between share classes, they alleged, was that the lower-cost share classes were available only to Plans that had larger investments – but in all cases, [the plan] was large enough to qualify for the lower cost share class. One issuer, for example, allegedly offered cheaper institutional shares for which [the plan] readily qualified. On these pleadings, the [the plaintiffs] have plausibly alleged that [the defendants] imprudently failed to offer these discounted shares.

*Id.* (cleaned up). In short, the plaintiffs' claim was plausible because they pleaded that the plan qualified for institutional shares, yet the defendants only chose to offer the higher-fee retail shares. *See id.*

Plaintiffs' complaint is factually distinct from *Forman* and the cases cited within that opinion. Unlike those cases, Plaintiffs have not alleged that Defendants obtained retail shares when institutional shares were readily available. (*See* Doc. No. 20 at 571-75, ¶¶ 98-108.) Rather, Plaintiffs allege Defendants failed to obtain institutional shares with lower fees than the institutional shares the Plan offered. (*See id.*) Instead of addressing this factual distinction – retail versus institutional shares – and explaining why these cases nonetheless apply, Plaintiffs rotely cite language from the opinions. (*See* Doc. No. 48 at 1578-79.)

For example, Plaintiffs cite expert testimony stated during a California bench trial to support the following allegation: "[t]o the extent the Plan's investments advertised minimum investment thresholds for the lowest-cost institutional shares, the investment provider would have waived those requirements based on the Plan's size, if the Defendants had requested such a

waiver." (Doc. No. 20 at 572-73, ¶¶ 102-03 (citing *Tibble v. Edison Int'l*, No. CV 07-5359SVW(AGRX), 2010 WL 2757153, at *9 (C.D. Cal. July 8, 2010)).)  At the *Tibble* trial, the judge heard unrefuted expert testimony establishing that there were "no absolute" investment minimums for base-level institutional shares, and the fund managers "would have waived the investment minimum for the Plan had [the defendants] asked them to do so."  *Tibble*, 2010 WL 2757153, at *29-30.  One expert explained that this was so because an initial investment by a plan with a large amount of assets could lead to future investments, and the fund managers were therefore incentivized to allow waivers out of retail shares and into the shares reserved for large investors.  *Id.* at *29.

But Plaintiffs did not allege anything establishing that the *Tibble* expert testimony is relevant to the unique factual context described in their complaint.  They did not allege that Vanguard or Northern Trust have "no absolute" minimums for their lowest-fee institutional shares.  (*See* Doc. No. 20 at 572-73, ¶¶ 102-03; Doc. No. 48 at 1577-79.)  Nor have they pleaded or offered any argument why Northern Trust or Vanguard would oblige Defendants' request for a waiver of the investment thresholds for the lowest-fee shares.  (*See* Doc. No. 20 at 572-73, ¶¶ 102-03; Doc. No. 48 at 1577-79.)  Without these allegations, Plaintiffs' lone allegation that the investment thresholds would have been waived upon request is speculative and conclusory.  *See In re E.I. du Pont de Nemours & Co.*, 2023 WL 8183812, at *3 (6th Cir. Nov. 27, 2023) (determining the plaintiff's allegation that defendants contaminated his blood was conclusory because the plaintiff did not allege any additional allegations supporting why the allegation was plausible).[7]

---

[7] Plaintiffs cite cases teaching that it would be imprudent for a fiduciary to be completely unaware that lower-fee shares existed.  (*See* Doc. No. 48 at 1578 (citing *Washington Univ.*, 960 F.3d at 483).)  But Plaintiffs have not alleged sufficient facts to infer that the Defendants were

Beyond its failure to reckon with *Forman*'s unique facts, Count Two fails *Forman*'s "context-sensitive" inquiry for ERISA fiduciary duty breach claims.  40 F.4th at 453.  Unlike the complaint in *Forman*, where the plaintiffs alleged that the plan *qualified* for lower-fee shares but did not obtain them, Plaintiffs here allege that the lower-fee shares could have been obtained through bargaining due to the Plan's size.[8]  *Id.* at 453.  (Doc. No. 20 at 572-73, ¶ 102.)  Without any additional context, Plaintiffs' theory is nothing more than a "naked assertion devoid of . . . factual enhancement."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (quotation marks and brackets omitted).  And through this naked assertion, Plaintiffs have only shown that their claim of imprudence is "possible and conceivable" but not "plausible and cognizable."  *CommonSpirit*, 37 F.4th at 1167.  The law only allows "plausible" and "cognizable" claims to survive a Rule 12(b)(6) challenge.  *See id.*; *see also Iqbal*, 556 U.S. at 680.

In the end, the *Forman* court explicitly warned that its decision was not a "universal golden ticket past a motion to dismiss."  40 F.4th at 453.  Plaintiffs essentially ask this Court to find that any time a plaintiff alleges a large plan did not obtain the lowest-fee shares, plan beneficiaries and participants have stated viable ERISA fiduciary duty claim.  To Plaintiffs, no other factual allegations are required – only the size of the plan and the existence of shares with

---

unaware of the even lower-fee institutional shares for the Vanguard and Focus Funds.  This is so because Defendants *did* obtain the lower-fee institutional shares for some of the challenged Vanguard Funds after the Plan met the minimum investment thresholds.  (*Compare* Doc. No. 47-2 at 1278 (the "Vanguard Extended Market Index Fund Institutional Shares" were offered) *with* Doc. No. 47-3 at 1294 (the "Vanguard Extended Market Index Fund Institutional Plus Shares" were offered)).

[8] The Court notes – and as explained, without any refutation, in the motion to dismiss – for the Vanguard Total International Stock Index and the Vanguard Total Bond Market Index, the Plan was not close $100 million investment threshold.  (Doc. No. 46 at 1235 n.7 (citing Plan documents and explaining that the Plan had invested between $20 and $90 million in the Vanguard Total International Stock Index from 2014-2019 and between $45 million and $80 million in the Vanguard Total Bond Market Index during the same period).)

lower fees must be pleaded. Rubber-stamping this view is inconsistent with binding authority. *See id.* Accordingly, Defendants' motion to dismiss Count Two is granted.

### D. Count Three

The parties agree that Count Three's fate is contingent on the success or failure of Counts One and Two. (Doc. No. 46 at 1251; Doc. No. 48 at 1579.) Because the Court has granted Defendants' motion as it relates to Counts One and Two, it must also do so for Count Three. *Saumer v. Cliffs Nat. Res. Inc.*, No. 1:15-CV-954-DAP, 2016 WL 8668509, at *8 (N.D. Ohio Apr. 1, 2016) (collecting cases for the proposition that ERISA failure to monitor claims must be dismissed if there is no viable underlying breach of fiduciary duty claim), *aff'd,* 853 F.3d 855 (6th Cir. 2017).

### III. <u>Conclusion</u>

For the reasons stated above, Defendants' motion to dismiss is GRANTED. This case is dismissed.

**IT IS SO ORDERED.**

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE

**Date**: December 4, 2023

22